IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

UNITED STATES OF AMERICA,

     v.

COREY JOHNSON,
    Defendant.

Criminal No. 3:92cr68 (DJN)

## MEMORANDUM OPINION
### (Dismissing § 2255 Petition)

Convicted serial killer Corey Johnson ("Defendant" or "Johnson") comes before the

Court with a Motion Pursuant to 28 U.S.C. § 2255 Raising Claim of Ineligibility to Be Executed

Under 18 U.S.C. § 3596(c) ((the "Present § 2255 Petition") (ECF No. 86)), attempting to

relitigate a question decided long-ago — a question that the Court lacks jurisdiction to decide

again.  Specifically, the Court and the Fourth Circuit have already rejected Defendant's claim

that his intellectual disability[1] precludes the Government from executing him, and only the

Fourth Circuit can decide whether to revisit those decisions.  Yet Defendant attempts to skirt the

rules in hopes of finding a court that will stay his execution, scheduled for January 14, 2021,

regardless of whether the Court has the authority to do so.  Indeed, district courts generally lack

jurisdiction to consider successive § 2255 petitions absent preauthorization from the Court of

Appeals.  This case presents no exception to that requirement.  Accordingly, for the reasons

stated below, the Court will dismiss Defendant's Present § 2255 Petition for want of jurisdiction.

---

[1]    The Court uses the term "intellectual disability" rather than "mental retardation"
throughout this Opinion.  However, in the prior proceedings on this same question and the earlier
caselaw, courts use the terms interchangeably.

# I.    BACKGROUND[2]

## A.    Factual Background

Defendant, along with Richard Tipton ("Tipton") and James Roane, Jr. ("Roane") (collectively, the "partners"), ran a substantial drug-trafficking conspiracy that lasted from 1989 through July of 1992.  *Roane*, 378 F.3d at 389.  The partners in the conspiracy obtained wholesale quantities of powder cocaine from suppliers in New York City, converted it into crack cocaine, divided it among themselves and then distributed it through a network of 30-40 street level dealers.  *Id.* at 389-90.  Typically, the partners took two-thirds of the proceeds realized from the street-level sales of their product.  *Id.* at 390.

Over a short time in early 1992, the partners took part, in some form, in the murders of ten persons in the Richmond area.  *Id.*  These murders occurred "in relation to their drug-trafficking operation and either because their victims were suspected of treachery or other misfeasance, or because they were competitors in the drug trade, or because they had personally offended one of the 'partners.'"  *Id.*  The murders described below directly implicated Defendant.

On January 14, 1992, Roane and Johnson located Peyton Johnson, another rival drug dealer, at a tavern.  *Id.*  Shortly after Roane left the tavern, Corey Johnson entered and fatally shot Peyton Johnson with a semiautomatic weapon.  *Id.*

On January 29, 1992, Roane pulled his car around the corner of an alley, got out and shot Louis Johnson, who had threatened one of the partners while acting as a bodyguard for a rival

---

[2]    The Court takes these background facts from the Fourth Circuit's opinion in *United States v. Roane*, 378 F.3d 382 (4th Cir. 2004), which recited the factual summary *in haec verba* from *United States v. Tipton*, 90 F.3d 861 (4th Cir. 1996), the opinion on the defendants' direct appeal.  The Court also recited these facts in its Memorandum Order denying Defendant's First Step Act Motion (ECF No. 75).

drug dealer. *Id.* Corey Johnson and Lance Thomas ("Thomas") then got out of Roane's car and began firing at Louis Johnson. *Id.* As Louis Johnson laid on the ground, either Corey Johnson or Thomas shot him twice at close range. *Id.* Louis Johnson died from these gunshot wounds. *Id.*

On February 1, 1992, Roane, Johnson and Thomas went to the apartment of Torrick Brown, who had given Roane trouble. *Id.* After the three men knocked on the apartment door, Brown's half-sister opened the door and summoned Brown. *Id.* The three men opened fire with semiautomatic weapons, killing Brown and critically wounding his half-sister. *Id.*

In late January 1992, after Johnson threatened Dorothy Armstrong for not paying for a supply of crack cocaine, Armstrong went to live with her brother, Bobby Long. *Id.* On February 1, 1992, Johnson, Tipton and Jerry Gaiters ("Gaiters") went to Long's house. *Id.* at 391. While Tipton waited in the car, Johnson and Gaiters approached the front door. *Id.* When Long opened the door, Johnson opened fire, killing Dorothy Armstrong and Anthony Carter. *Id.* As Bobby Long fled out the front door, Johnson shot him dead in the front yard. *Id.*

On February 19, 1992, Johnson arranged to meet with Linwood Chiles, who Johnson suspected of cooperating with the police. *Id.* That night, Chiles and Johnson drove off together in Chile's station wagon, with Curtis Thorne and sisters Priscilla and Gwen Greene also in the car. *Id.* Chiles parked in an alley before Tipton parked behind the station wagon and walked up beside it. *Id.* With Tipton standing by, Johnson told Chiles to place his head on the steering wheel before shooting him twice at close range. *Id.* The partners fired additional shots, killing Thorne and critically wounding the Greene sisters in the station wagon. *Id.*

**B.     Verdict and Sentencing**

In January and February of 1993, then-United States District Judge James R. Spencer

3

presided over the trial of Defendant and his co-conspirators. Defendant[3] faced capital murder

charges for Murder in Furtherance of a Continuing Criminal Enterprise ("CCE") under 21 U.S.C.

§ 848(e)(1)(A) for seven of these killings — Peyton Johnson (Count Eight), Louis Johnson

(Count Eleven), Armstrong (Count Seventeen), Carter (Count Eighteen), Long (Count Nineteen),

Thorne (Count Twenty-Four) and Chiles (Count Twenty-Five) (collectively, the "Capital Murder

Counts"). *Id.* at 391; (Second Superseding Indictment ("Indictment") (Dkt. No. 115) at 7-18).

On February 3, 1993, the jury convicted him of all seven Capital Murder Counts. 378 F.3d at

391.[4]

During the penalty hearing, Defendant's expert psychologist, Dr. Dewey Cornell,

testified that Defendant did not qualify as intellectually disabled, but that he tested just above

that level. (May 1, 2003 Mem. Op. Denying § 2255 Petition ("First § 2255 Op.") (Dkt. No. 896)

at 81.) Dr. Cornell found that Defendant had an IQ of 77. (*Id.*) To ensure the accuracy of his

findings, Dr. Cornell rechecked his scores, consulted his colleagues, interviewed Defendant a

second time, interviewed individuals involved in Defendant's life and reviewed a substantial

amount of background information regarding Defendant. (*Id.*; Tr. of Feb. 10, 1993 Penalty

Phase ("Tr.") at 3565-75.) Because Defendant's own expert did not find him intellectually

---

[3]     The Court tried Roane, Tipton and Johnson along with four other defendants on a thirty-three-count superseding indictment.

[4]     The jury also convicted Defendant of one count of participating in a Conspiracy to Possess Cocaine Base with Intent to Distribute, in violation of 21 U.S.C. § 846 (Count One); one count of engaging in a CCE, in violation of 21 U.S.C. § 848(a) (Count Two); eleven counts of Committing Acts of Violence in Aid of Racketeering ("VICAR"), in violation of 18 U.S.C. § 1959 (Counts Ten, Thirteen, Fourteen, Sixteen, Twenty-One, Twenty-Two, Twenty-Three, Twenty-Seven, Twenty-Eight, Twenty-Nine, Thirty); five counts of Use of a Firearm in Relation to a Crime of Violence or Drug Trafficking Offense, in violation of 18 U.S.C. § 924(c) (Counts Nine, Twelve, Fifteen, Twenty, Twenty-Six); and two counts of Distribution of or Possession with Intent to Distribute Crack Cocaine, in violation of 21 U.S.C. § 841(a)(1) (Counts Thirty-One and Thirty-Two). *Roane*, 378 F.3d at 392; (Dkt. Nos. 466, 593).

disabled, Defendant's counsel did not argue that Defendant's intellectual disability rendered him ineligible for the death penalty. (First § 2255 Op. at 84.) However, he did argue that the same reasons underlying the prohibition against executing the intellectually disabled mitigated against the imposition of the death penalty on Defendant. (*Id.*)

On February 16, 1993, following the penalty hearing, the jury recommended that the Court sentence Defendant to death for all seven of the Capital Murder Counts. *Roane*, 378 F.3d at 392. On the Special Findings Form, the jury indicated that it had unanimously found that Defendant committed each of the seven murders "after substantial planning and premeditation." (Dkt. No. 508 at 2.) Eight of the jurors found, by a preponderance of the evidence, that Defendant's "full scale I.Q. is 77." (Dkt. No. 508 at 9.) On June 1, 1993, pursuant to 21 U.S.C. § 848(l), the Court sentenced Johnson to death for Counts Eight, Eleven, Seventeen, Eighteen, Nineteen, Twenty-Four and Twenty-Five. (Dkt. No. 593.)

However, the Court refused to order the execution on the grounds that Congress had neither directly authorized the means to carry out the death sentences, nor properly delegated to the Attorney General the authority to issue the implementing regulations that the Government invoked. *Roane*, 378 F.3d at 392. As a result, the Court stayed the execution of the death sentences until such time as Congress had authorized the means of execution. *Id.*

C.      **Direct Appeal**

The defendants appealed their convictions and sentences and the Government cross-appealed the stay of the death sentences. *Id.* at 392. In a lengthy opinion, the Fourth Circuit analyzed and disposed of approximately sixty issues, including challenges by the defendants to aspects of the jury-selection process and both the guilt and penalty phases of the trial. *Tipton*, 90 F.3d at 868. The Fourth Circuit rejected nearly all of the claims, affirming the convictions and

sentences of all of the defendants, except that it vacated on Double Jeopardy grounds the drug conspiracy convictions under 21 U.S.C. § 846. *Id.* at 903. Additionally, the Fourth Circuit vacated the stay of the death sentences and remanded for the executions to proceed in accordance with regulations promulgated by the Attorney General. *Id.* at 901-03.

### D.      First § 2255 Petition

On June 1, 1998, Defendant filed a petition under 28 U.S.C. § 2255 to vacate or set aside his sentences (the "First § 2255 Petition" (Dkt. No. 714)). Among other challenges to his conviction and sentence, Defendant argued that his intellectual disability precluded the Government from executing him. As part of his intellectual disability challenge, Defendant argued that his counsel had been ineffective in failing to argue at sentencing that Defendant could not be executed due to his intellectual disability. In arguing that "[u]nder federal law, a mentally retarded defendant cannot be executed," Defendant cited both 18 U.S.C. § 3596(c) and 21 U.S.C. § 848(l). (Dkt. No. 719 at 108).

In his First § 2255 Petition, Defendant did not submit any evidence from Dr. Cornell expressing doubt about his conclusions regarding Defendant's lack of intellectual disability. (First § 2255 Op. at 82.) The Court permitted multiple amendments to the First § 2255 Petition and granted Defendant "another full opportunity to demonstrate that he is mentally retarded." (*Id.*) Defendant submitted no new evidence regarding his intellectual disability. (*Id.*)

On May 1, 2003, the Court entered a lengthy opinion denying the First § 2255 Petition. The Court expressly rejected the argument that 18 U.S.C. § 3596(c) precluded the execution of Defendant on the grounds of his mental disability, because "the record before the Court demonstrates that Johnson is not mentally retarded." (First § 2255 Op. at 82.) The Court also rejected Defendant's ineffective assistance of counsel claims, finding that counsel acted

reasonably in not arguing intellectual disability when his own expert disputed that conclusion. (*Id.* at 84.) Consequently, the Court denied Defendant's First § 2255 Petition on the merits.

Defendant appealed the denial of his First § 2255 Petition. (Dkt. No. 908.) In arguing that "Johnson's execution is barred by statute," Defendant cited both 18 U.S.C. § 3596(c) and 21 U.S.C. § 848(l). (Appellants' Br., *United States v. Johnson*, No. 03-13 (4th Cir. Feb. 17, 2004) at 144-45.) On August 9, 2004, the Fourth Circuit affirmed this Court's denial of the First § 2255 Petition. *Roane*, 378 F.3d at 408. The Fourth Circuit noted that federal law prohibits the carrying out of a sentence of death upon a person of intellectual disability. *Id.* However, the Fourth Circuit rejected Defendant's argument that the law barred his execution, stating plainly that "Johnson is not barred from execution due to mental retardation." *Roane*, 378 F.3d at 408-09. The Fourth Circuit also rejected Defendant's argument that his counsel had rendered ineffective assistance by failing to raise additional intellectual disability arguments at sentencing. *Id.* In sum, the Fourth Circuit agreed with this Court on the merits of Defendant's intellectual disability challenge in his First § 2255 Petition.

### E.     Other Attacks on His Sentence

Defendant has attempted to invalidate his sentences on several other occasions. In 2016, Defendant filed multiple § 2244 applications with the Fourth Circuit for authorization to file successive § 2255 petitions to invalidate his § 924(c) convictions. The Fourth Circuit denied his requests. *In re Corey Johnson*, No. 16-4 (4th Cir. 2016), ECF Nos. 2, 10; *In re Corey Johnson*, No. 16-13 (4th Cir. 2016), ECF Nos. 2, 8. In 2019, the Fourth Circuit again denied Defendant's § 2244 application for authorization to file a successive § 2255 petition. *In re Corey Johnson*, No. 19-1 (4th Cir. 2019), ECF Nos. 1, 13. On May 22, 2020, in the wake of the Supreme Court's decision in *United States v. Davis*, 139 S. Ct. 2319 (2019), Defendant filed yet another § 2244

application with the Fourth Circuit for authorization to file a successive § 2255 petition. The Fourth Circuit has placed the case in abeyance pending its decision in *United States v. Dickerson. In re Corey Johnson*, No. 20-8 (4th Cir. 2020), ECF Nos. 2, 23. The proposed petition attached to the § 2244 application does not raise the same issues that Defendant raises in the Present § 2255 Petition.

On August 19, 2020, Defendant filed a motion in this Court under the First Step Act (ECF No. 38), arguing that the Court should reduce his death sentences under the statute enacted to reduce sentences for nonviolent crack offenders. The motion had no merit and amounted to another thinly-veiled attempt by Defendant to relitigate his intellectual disability claim. (ECF No. 39 at 16-31.) Consequently, the Court denied it. (ECF No. 75.) Defendant has appealed that decision to the Fourth Circuit. (ECF No. 77.)

Most recently, on December 23, 2020, Defendant filed a motion in the United States District Court for the District of Columbia, asking that court to enjoin his execution on the basis that he has tested positive for Coronavirus-2019. *In The Matter of The Federal Bureau of Prisons' Execution Protocol Cases*, No. 19mc145 (TSC) (D.D.C.), Dkt. No. 373. That motion remains pending.

F.      **Defendant's Present § 2255 Petition**

On November 20, 2020, the Government informed Defendant that it had scheduled his execution to occur on January 14, 2021. (ECF No. 78.) On December 14, 2020, Defendant filed the Present § 2255 Petition. (ECF No. 86.) Defendant argues that he suffers from an intellectual disability and, therefore, proves ineligible for execution. Defendant asks this Court to issue an order prohibiting his execution on January 14, 2021, and to enjoin his execution until the Court can hold an evidentiary hearing on his intellectual disability. (Present § 2255 Pet. at 3.)

Defendant argues that the Present § 2255 Petition does not constitute a "second or successive" petition, thereby eliminating the requirement to seek authorization to file from the Fourth Circuit, because 18 U.S.C. § 3596(c) provides for review of an intellectual disability claim when the Government sets an execution date.  (Present § 2255 Pet. at 43.)

On December 15, 2020, the Court recognized that district courts generally lack jurisdiction to entertain second or successive 28 U.S.C. § 2255 motions without preauthorization from the appropriate Court of Appeals.  Therefore, it ordered the parties to brief the limited question of whether Defendant must first seek authorization from the Fourth Circuit and whether the Court has jurisdiction to consider the Present § 2255 Petition.  (ECF No. 95.)  On December 21, 2020, the Government responded (Govt's Resp. to Court's December 15, 2020 Order ("Govt's Resp.") (ECF No. 96)), arguing that the Court lacks jurisdiction to consider the Present § 2255 Petition.  On December 24, 2020, Defendant filed Corey Johnson's Reply Pursuant to December 15, 2020 Order (ECF No. 97), rendering this matter now ripe for review.

## II.    ANALYSIS

Because the general prohibition on filing second or successive § 2255 petitions calls into question the Court's jurisdiction, the Court must first resolve that issue to determine whether it has jurisdiction to entertain the Present § 2255 Petition.  In making this determination, the Court will review the general prohibition against second or successive § 2255 petitions before determining whether the Present § 2255 Petition falls under that prohibition.  This analysis involves examining the interplay between habeas law and the Federal Death Penalty Act ("FDPA"), which provides, in relevant part, that "a sentence of death shall not be carried out upon a person who is mentally retarded."  18 U.S.C. § 3596(c).[5]  Because the Court ultimately

---

[5]     The Court notes that the parties dispute whether Defendant could raise a challenge under

9

determines that Defendant must obtain authorization from the Fourth Circuit to file the Present § 2255 Petition, it will not reach the merits of the Petition.

### A.     The Current Statutory Restrictions on Second or Successive § 2255 Petitions

"[I]t is 'particularly egregious' to enter a stay on second or subsequent habeas petitions unless 'there are substantial grounds upon which relief might be granted.'" *Delo v. Blair*, 509 U.S. 823, 823 (1993) (quoting *Herrera v. Collins*, 506 U.S. 390, 425-26 (1993) (O'Connor, J., joined by Kennedy, J., concurring)).  Nevertheless, before the passage of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the appellate courts often had "to vacate last minute stays of executions granted by district courts ruling on procedurally defaulted claims in successive petitions." *Stockton v. Angelone*, 70 F.3d 12, 13 (4th Cir. 1995) (citing *Peterson v. Murray*, 949 F.2d 704 (4th Cir. 1991)); *Evans v. Muncy*, 916 F.2d 163 (4th Cir. 1990); *Clanton v. Bair*, 826 F.2d 1354 (4th Cir. 1987); *see id.* (observing that petitioner's habeas petition "reflects a formula for eleventh-hour relief that is increasingly common in capital cases").

In the wake of these and other practices, the AEDPA restricted the jurisdiction of the district courts to hear second or successive applications for federal habeas corpus relief by prisoners attacking the validity of their convictions and sentences by establishing a "gatekeeping mechanism." *Felker v. Turpin*, 518 U.S. 651, 657 (1996) (internal quotation marks omitted). Specifically, as pertinent here, 28 U.S.C. § 2255(h) states:

---

§ 3596(c), given that the Court sentenced him to death under the now-repealed sentencing provisions of 21 U.S.C. § 848, rather than the FDPA.  Indeed, the United States District Court for the District of Columbia recently ruled that Defendant lacked standing to challenge his execution under § 3596(a). *In the Matter of Federal Bureau of Prisons' Execution Protocol Cases*, No. 19mc145, ECF No. 378 (D.D.C. Dec. 30, 2020).  Nevertheless, § 848(l) and § 3596(c) contain identically worded prohibitions on executing intellectually disabled individuals.  Here, the Court need not reach the merits of whether Defendant can raise a challenge under § 3596(c), because Defendant's Present § 2255 Petition qualifies as second and successive even assuming § 3596(c) applies to him.

(h) A second or successive motion must be certified as provided in section 2244 by a panel of the appropriate court of appeals to contain—

(1) newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense; or

(2) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable.

28 U.S.C. § 2255. Section 2244, in turn provides, "[b]efore a second or successive application permitted by this section is filed in the district court, the applicant shall move in the appropriate court of appeals for an order authorizing the district court to consider the application." 28 U.S.C. § 2244(b)(3)(A). "The core of the AEDPA restrictions on second or successive § 2255 petitions is related to the longstanding judicial and statutory restrictions embodied in the form of res judicata known as the 'abuse of the writ' doctrine." *United States v. Barrett*, 178 F.3d 34, 44 (1st Cir. 1999); *see Felker*, 518 U.S. at 663–64 (citation omitted) (observing that the AEDPA's restrictions on successive petitions "transfers from the district court to the court of appeals [the] screening function" for petitions that constitute an abuse writ). "In the absence of pre-filing authorization, the district court lacks jurisdiction to consider an application containing abusive or repetitive claims." *United States v. Winestock*, 340 F.3d 200, 205 (4th Cir. 2003), *abrogated in part on other grounds by United States v. McRae*, 793 F.3d 392 (4th Cir. 2015).

Here, the parties do not dispute that Defendant neither sought nor obtained authorization from the Fourth Circuit to file the Present § 2255 Petition. Nor do they dispute that Defendant previously filed a § 2255 petition. Instead, they dispute whether the requirement to obtain authorization applies to this claim.

### B. Defendant's Present § 2255 Petition Constitutes a Second or Successive Petition.

Defendant argues that he did not need to obtain authorization from the Fourth Circuit,

11

because the Present § 2255 Petition does not constitute a second or successive § 2255 petition within the meaning of § 2255(h).  "[I]t is settled law that not every numerically second petition [or motion] is a 'second or successive' petition [or motion] within the meaning of the AEDPA." *United States v. Hairston*, 754 F.3d 258, 262 (4th Cir. 2014) (quoting *In re Williams*, 444 F.3d 233, 235 (4th Cir. 2006)).  The Supreme Court has "described the phrase 'second or successive' as a 'term of art.'" *Magwood v. Patterson*, 561 U.S. 320, 332 (2010) (quoting *Slack v. McDaniel*, 529 U.S. 473, 486 (2000)).  In assessing "what qualifies as second or successive," courts should look for guidance in:  (1) "historical habeas doctrine and practice"; and, (2) the "AEDPA's own purposes." *Banister v. Davis*, 140 S. Ct. 1698, 1705–06 (2020).  As explained below, both these guides convincingly demonstrate that the Present § 2255 Petition constitutes a second or successive § 2255 petition within the meaning of 28 U.S.C. § 2255(h).

> ### i. *Historical Principles Dictate Treating the Present § 2255 Petition as a Second or Successive § 2255 Petition.*

Under the historical guide, if the litigant's "later-in-time filing would have "constituted an abuse of the writ, as that concept is explained in . . . [pre-AEDPA] cases . . . it is successive; if not, likely not." *Id.* (alteration in original) (internal quotation marks omitted) (citation omitted).  The doctrine of abuse of the writ

> mandates dismissal of claims presented in habeas petitions if the claims were raised, or could have been raised, in an earlier petition.  Thus, the doctrine "encourages petitioners to present their claims simultaneously for resolution, rather than fragmenting grounds for collateral relief or advancing endless permutations of the same themes."

*Noble v. Barnett*, 24 F.3d 582, 585 (4th Cir. 1994) (quoting *Miller v. Bordenkircher*, 764 F.2d 245, 248 (4th Cir. 1985)).  Defendant contends that his claim could not have been raised earlier, likening it to the mental competency claims that courts have found unripe.  (Present § 2255 Pet. at 45.)

12

The decision of *Stewart v. Martinez–Villareal*, 523 U.S. 637 (1998), cited by Defendant, illustrates how the historical habeas practice informs AEDPA jurisprudence in determining whether a second in time application for relief constitutes a second or successive application.   In *Stewart*, Martinez-Villareal's federal habeas petition, filed in 1993, contained a number of claims for relief, including a claim pursuant to *Ford v. Wainwright*, 477 U.S. 399 (1986), that his mental incompetence precluded his execution ("*Ford* claim").  *Id.* at 640.  The district court dismissed Martinez-Villareal's *Ford* claim as premature and, after remand, denied the remainder of the petition for a writ of habeas corpus.  *Id.*

Later, the state set an execution date for the petitioner.  *Id.*  Martinez-Villareal then sought relief in federal court on his *Ford* claim.  *Id.* at 640–41.  The state asserted that this subsequent request for federal habeas relief required prefiling authorization from the Court of Appeals pursuant to 28 U.S.C. § 2244(b).  *Id.*  The Supreme Court rejected the state's position and noted:

> [The most recent petition] may have been the second time that [Martinez-Villareal] had asked the federal courts to provide relief on his *Ford* claim, but this does not mean that there were two separate applications, the second of which was necessarily subject to [the second or successive petition].  There was only one application for habeas relief, and the District Court ruled (or should have ruled) on each claim at the time it became ripe.  [Martinez-Villareal] was entitled to an adjudication of all of the claims presented in his earlier, undoubtedly reviewable, application for federal habeas relief.

*Id.* at 643–44.  The Supreme Court compared Martinez-Villareal's position to "a petitioner who returns to a federal habeas court after exhausting state remedies."  *Id.* at 644.  And, with a nod to the abuse of the writ doctrine, noted that Martinez-Villareal's "*Ford* claim would not be barred under any form of res judicata.  [Martinez-Villareal] brought his claim in a timely fashion, and it has not been ripe for resolution until now."  *Id.* at 645; *see also Slack*, 529 U.S. at 478, 487 (declining to apply § 2244(b) to a second application where the district court dismissed the first

application for lack of exhaustion).

Unlike the *Ford* claim in *Stewart v. Martinez–Villareal*, Defendant has already raised his claim that his intellectual disability precludes his execution in his First § 2255 Petition. And, both this Court and the Fourth Circuit rejected it on the merits. *United States v. Roane*, 378 F.3d 382, 409 (4th Cir. 2004) ("Johnson is not barred from execution due to mental retardation."). Thus, res judicata would bar the claim.

Defendant unconvincingly compares his intellectual disability claim to the incompetency claim of Martinez-Villareal and similar litigants whose claims were not ripe or did not arise until after they filed their first request for federal habeas relief. (Present § 2255 Pet. at 44.) Yet, in comparing the two claims, Defendant "confuse[s] intellectual disability with the temporary condition of incompetency, which may come and go." *Bourgeois v. Watson*, 977 F.3d 620, 637 (7th Cir. 2020) (citing *Ford*, 477 U.S. 399; *Williams v. Kelley*, 858 F.3d 464, 472 (8th Cir. 2017); *Busby v. Davis*, 925 F.3d 699, 713 (5th Cir. 2019)), *cert. denied sub nom. Bourgeois v. Watson*, No. 20–6500, 2020 WL 7296816 (U.S. Dec. 11, 2020). Importantly, "[i]ntellectual disability is a permanent condition that must manifest before the age of 18." *Id.* (citing *Atkins v. Virginia*, 536 U.S. 304, 318 (2002)).

Moreover, the distinct penological purposes behind the respective prohibitions on executing the intellectually disabled and the mentally incompetent underscore the difference in the time at which a defendant may successfully raise each claim. In *Ford*, the Supreme Court indicated that the prohibition on executing the mentally incompetent stemmed from the defendant's lack of comprehension regarding the punishment that he would soon suffer: "we may seriously question the retributive value of executing a person who has no comprehension of why he has been singled out and stripped of his fundamental right to life." 477 U.S. at 409-10.

14

Similarly, Justice Powell wrote in concurrence that the Eighth Amendment "forbids the execution only of those who are unaware of the punishment they are about to suffer and why they are to suffer it." *Id.* at 422 (Powell, J., concurring).  Indeed, the *Ford* Court noted the various stages at common law at which a defendant could raise a distinct competency claim, *e.g.*, when pleading an insanity defense, when asserting incompetence to stand trial or before execution. *Id.* at 406-07.  Each could require a different competency assessment. *Id.*

Conversely, the prohibition on executing the intellectually disabled stems from the defendant's diminished moral culpability for the crime.  As the Supreme Court has stated, "[t]he diminished capacity of the intellectually disabled lessens moral culpability and hence the retributive value of the punishment." *Hall v. Florida*, 572 U.S. 701, 709 (2014).  Likewise, the diminished ability to control his conduct through foresight and reason renders a potential death sentence an unlikely deterrent for an intellectually disabled individual. *Id.*  Moreover, the prohibition also serves to protect the trial process, as intellectually disabled persons "are more likely to give false confessions, are often poor witnesses, and are less able to give meaningful assistance to their counsel." *Id.*

Thus, the prohibition on executing the intellectually disabled has a foundation in the mental state of the defendant at the time of the crime and trial.  And, this mental state manifests early in life and would not change as a defendant's execution nears.  For this reason, courts may consider challenges that a defendant's intellectual disability precludes a death sentence at all phases of the trial and sentence. *See, e.g., United States v. Salad*, 959 F. Supp. 2d 865, 867-68 (E.D. Va. 2013) (considering the defendant's *Atkins* and § 3596(c) challenges before trial); *Ortiz v. United States*, 664 F.3d 1151, 1165-66 (8th Cir. 2011) (considering the defendant's *Atkins* and § 3596(c) challenges at the habeas stage).  Conversely, the prohibition on the execution of the

mentally incompetent has a foundation in the mental state of the defendant at the time of his execution. This mental state can change and may not have manifested before the crime or trial. Consequently, an intellectual disability challenge ripens before a defendant files the first petition for federal habeas relief, whereas a competency challenge may not ripen until later.

Here, Defendant's intellectual disability ripened years ago, and the courts rejected it years ago. Indeed, both this Court and the Fourth Circuit ruled on Defendant's intellectual disability claim on the merits, rather than dismissing it as unripe. Therefore, his current attempt to relitigate that claim would be deemed an abuse of the writ. *See Noble*, 24 F.3d at 585 (observing that the abuse of the writ doctrine "mandates dismissal of claims presented in habeas petitions if the claims were raised [and rejected] . . . in an earlier petition."). Accordingly, guidance from historical habeas jurisprudence directs that Defendant's Present § 2255 Petition constitutes a second or successive § 2255 petition within the meaning of 28 U.S.C. § 2255(h).

> **ii.    *The Statutory Aims of the AEDPA Indicate that the Present § 2255 Petition is a Second or Successive § 2255 Petition.***

The purpose behind the AEDPA's restrictions on multiple requests for federal habeas relief was to "conserve judicial resources, reduc[e] piecemeal litigation," and "lend[ ] finality to . . . judgments within a reasonable time." *Banister*, 140 S. Ct. at 1706 (alterations in original) (ellipses added) (interpreting 28 U.S.C. § 2244(b)) (quoting *Panetti v. Quaterman*, 551 U.S. 930, 945–46 (2007)). As explained below, not treating the Present § 2255 Petition as a second or successive motion would frustrate these statutory aims.

> **a.    Defendant's § 3596(c) challenge does not differ from his previous *Atkins* challenge.**

Defendant's argument that the Present § 2255 Petition constitutes a fresh intellectual disability claim, distinct from his previously-failed challenges, contravenes the purposes behind the AEDPA. To succeed on this argument, Defendant argues that an *Atkins* challenge differs

16

entirely from a challenge under § 3596(c), because "[s]ection 3596(c) provides more specific process for inmates with compelling claims of intellectual disability than is afforded by the Eighth Amendment." (Present § 2255 Pet. at 45-46.) However, the statute does not list the more specific process for intellectually disabled individuals and Defendant offers no authority for this position, or examples of the additional process afforded to intellectually disabled inmates under § 3596(c). Additionally, this argument ignores the fact that courts regularly consider Eighth Amendment and § 3596(c) challenges in tandem, using the same standards. *See, e.g., Bourgeois*, 977 F.3d at 634 (applying analysis equally to both *Atkins* and § 3596(c) claim, because they both provide "the same substantive protection"); *United States v. Cisneros*, 385 F. Supp. 2d 567, 569-70 (E.D. Va. 2005) (analyzing § 3596(c) and *Atkins* claims as one); *United States v. Coonce*, 932 F.3d 623, 632-33 (8th Cir. 2019) (same).

Moreover, Congress could not have sought to include additional protections to the Eighth Amendment, as the passage of the FDPA predated the Supreme Court's holding in *Atkins* that the Eighth Amendment prohibits the execution of the intellectually disabled. Indeed, the Supreme Court heavily relied on the fact that Congress, along with many other states, had passed legislation prohibiting the execution of the intellectually disabled. 536 U.S. at 314. Rather than creating a separate and distinct prohibition from § 3596(c), the Supreme Court in *Atkins* "articulated the constitutional dimension to this prohibition." *Salad*, 959 F. Supp. 2d at 868.

Defendant's argument also ignores the history of *this case*. Defendant previously challenged his death sentence under § 3596(c), citing that provision in his First § 2255 Petition and in his appeal to the Fourth Circuit after the Court's denial of the First § 2255 Petition. Similarly, the Court cited both *Atkins* and § 3596(c) in its Opinion denying the First § 2255 Petition, singularly analyzing the challenges under each, just as Defendant presented them to the

Court.  (First § 2255 Op. at 80-84.)  Now, despite previously raising a challenge under § 3596(c),

Defendant argues for the first time that "adjudication pursuant to § 3596(c) is premature" before

the Government has set an execution date.  (Present § 2255 Pet. at 45.)  But, neither this Court,

the Fourth Circuit nor Defendant hinted that Defendant may have prematurely brought his

§ 3596(c) challenge.  Rather than conserving judicial resources and reducing piecemeal litigation

— the aims of the AEDPA — splitting the intellectual disability challenge in two would waste

judicial resources and encourage piecemeal litigation.

### b. Defendant's Textual Argument Lacks Merit.

Defendant argues that the language and structure of the text require the determination of

intellectual disability when the Government sets an execution date.  (Present § 2255 Pet. at 46.)

Defendant correctly points out that the statute does not allow the death penalty "to be carried

out" on a person with an intellectual disability.  Yet, contrary to Defendant's argument, it does

not follow that a determination on a defendant's intellectual disability must occur shortly before

execution.  A successful challenge under this provision that occurs pretrial, at sentencing or in

the time to raise a federal habeas petition will prevent the death sentence from being "carried

out" on the defendant.  It also makes little sense, given that the prohibition applies to a

permanent condition that — by definition — must have manifested before the defendant

committed the capital crime.  *Compare Atkins*, 536 U.S. at 318 (intellectual disability must

manifest before age of eighteen); *with Roper v. Simmons*, 543 U.S. 551 (2005) (prohibiting

imposition of death penalty on juvenile offenders).  For example, here, had Defendant's First

§ 2255 Petition succeeded in convincing the Court or the Fourth Circuit that he suffered from an

intellectual disability, his death sentence would not be carried out.

Likewise, Defendant points out that Congress placed the prohibition on executing the

18

intellectually disabled between the prohibition on executing pregnant or mentally incompetent individuals, two statuses that must be determined at the time of execution. (Present § 2255 Pet. at 48.) However, this section concerns who the Government may not execute. It does not concern when to determine ineligibility. The fact that eligibility for the other two types of individuals can only be determined on the eve of execution does not mean that the Court must re-review a determination of intellectual disability, particularly when the defendant's ineligibility would stem from a condition that has not developed since the previous determination.

Alternatively, Defendant's argument requires finding that § 3596(c) explicitly allows for two separate challenges — one before the expiration of federal habeas proceedings and another after the Government sets an execution date. Again, this position lacks any support in the caselaw. Moreover, it would require piecemeal litigation, the waste of judicial resources and a lack of finality of the defendant's death sentence, all in contravention to the aims of the AEDPA.

Defendant argues, without support, that when the Government schedules the execution of a person for which evidence of an intellectual disability exists, "§ 3596(c) requires that assessment to be made when the sentence is set to be implemented, even if that issue has been previously litigated." (Present § 2255 Pet. at 46.) This requirement would result in repeated litigation to determine a definitionally permanent condition. The Seventh Circuit recently considered, in the § 2241 context, a similar argument that § 3596(c) entitles the defendant to a new intellectual disability determination before execution. *Bourgeois*, 977 F.3d at 635-39. The court roundly rejected "that end-around § 2255(h)" argument that *Atkins* and § 3596(c) "forbid both the 'imposition' and the 'execution' of death sentences on the intellectually disabled" as follows:

> Intellectual disability is a permanent condition that must manifest before the age of 18. It would be senseless to proscribe the execution of someone who merely "was" intellectually disabled when they were sentenced, or who "will be" intellectually disabled when their sentence is carried out. Bourgeois seems to confuse intellectual disability with the temporary condition of incompetency, which may come and go. . . . And with no textual (or other) support, we are unwilling to accept Bourgeois's sweeping argument that a fresh intellectual-disability claim arises every time the medical community updates its literature.

*Id.* at 637-38 (internal citations omitted). The Supreme Court denied Bourgeois' petition for a writ of certiorari without explanation. *Bourgeois v. Watson*, 2020 WL 7296816 (U.S. Dec. 11, 2020). Defendant's argument that the Present § 2255 Petition does not constitute a successive petition depends on finding that a new intellectual disability claim has arisen. But, Defendant cannot claim that his intellectual functioning has changed since the previous determinations — only that the methods of assessing a potential intellectual disability have changed. However, the Court agrees with the Seventh Circuit that a fresh intellectual-disability claim does not arise every time the medical community updates its literature.

The Court is mindful of its role in protecting the intellectually disabled from execution. However, if Congress wanted to allow for an extra step in the review process, it could have done so. As it stands now, § 3596(c) neither explicitly nor implicitly states that a new intellectual disability claim arises when the Government schedules an inmate's execution. Because such a claim would frustrate the purposes of the AEDPA, the Court finds that § 3596(c) does not override the ban on successive § 2255 petitions. Accordingly, the Court finds that the Present § 2255 Petition constitutes a successive petition, such that the Fourth Circuit must first authorize Defendant to file it. Determining whether Defendant may pursue this successive petition falls beyond the power of this Court. Until the Fourth Circuit authorizes the filing of the successive petition, the Court lacks jurisdiction to entertain the merits of the petition.

## III.   CONCLUSION

In passing the AEDPA, Congress sought to put an end to the eleventh-hour relief that capital defendants often sought in district courts.  Defendant's litigation tactics highlight the need for a mechanism to stem the filing of last-minute claims.  Less than two weeks after asking this Court to enjoin his execution, and before the completion of the expedited limited briefing, Defendant asked the D.C. District Court to do the same.  The Court sentenced Defendant to death over twenty-five years ago, yet he now races to different courts looking for one to block his execution.  He made no effort to comply with the statutory obligations of the AEDPA, despite the fact that the Court and the Fourth Circuit previously rejected the exact claim that he states now entitles him to relief.  And, this case comes on the heels of Defendant filing several unrelated § 2244 applications for authorizations to file successive § 2255 petitions in the Fourth Circuit, along with an appeal of a First Step Act Motion that had no merit.

Because the Fourth Circuit has not authorized this Court to entertain Petitioner's Present § 2255 Petition, Defendant's Motion Pursuant to 28 U.S.C. § 2255 Raising Claim of Ineligibility to Be Executed Under 18 U.S.C. § 3596(c) (ECF No. 86) will be DISMISSED WITHOUT PREJUDICE for want of jurisdiction.

An appeal may not be taken from the final order in a § 2255 proceeding unless a judge issues a certificate of appealability ("COA").  28 U.S.C. § 2253(c)(1)(B).  A COA will not issue unless a prisoner makes "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  This requirement is satisfied only when "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'"  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4

(1983)).  For the reasons stated above, Defendant has not satisfied this standard.

An appropriate Order shall issue.

Let the Clerk file a copy of this Memorandum Opinion electronically and notify all counsel of record.

/s/

David J. Novak
United States District Judge

Richmond, Virginia
Dated:  January 2, 2021